1
2
3
4          UNITED STATES DISTRICT COURT
5          NORTHERN DISTRICT OF CALIFORNIA
6
7   S. H., et al.,                              Case No. 16-cv-04308-JCS
             Plaintiffs,
8
9        v.                                     **ORDER GRANTING PLAINTIFF'S**
                                                **MOTION FOR SUMMARY JUDGMENT**
10  MOUNT DIABLO UNIFIED SCHOOL                 **AND DENYING DEFENDANT'S**
    DISTRICT,                                   **MOTION FOR SUMMARY JUDGMENT**
11           Defendant.                         Re: Dkt. Nos. 28, 29
12

13  **I.    INTRODUCTION**

14          In this action, Plaintiff S.H. seeks judicial review of an administrative decision of

15  California's Office of Administrative Hearings ("OAH") under the Individuals with Disabilities

16  Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq*.  Presently before the Court are cross-motions

17  for summary judgment by S.H. and the Mount Diablo Unified School District. A hearing on the

18  motions was held on June 2, 2017.  Following the hearing, the parties filed supplemental briefs

19  addressing the question of what remedy the Court should award if it found that S.H. was entitled

20  to summary judgment with respect to any of the alleged errors on the part of the OAH.  For the

21  reasons stated below, the Court GRANTS Plaintiff's Motion for Summary Judgment ("Plaintiff's

22  Motion") and DENIES Defendant's Motion for Summary Judgment ("Defendant's Motion"). The

23  parties have consented to the jurisdiction of the undersigned United States magistrate judge

24  pursuant to 28 U.S.C. § 636(c).

25  **II.   BACKGROUND**

26          This case involves challenges to an Individualized Educational Plan ("IEP") dated October

27  14, 2015 relating to the 2015-2016 school year.  As of that date, S.H. was fifteen years old.  AR

28  603-604.  S.H. resides with his mother, Ms. Eleasha Partner ("Mother") within the geographical

boundaries of Mt. Diablo Unified School District ("Mt. Diablo") and is eligible for special education under the category of speech and language impairment. AR 603. He has been eligible for special education since he was three years old. *Id.*

During the 2014-2015 school year, S.H. attended ninth grade at Las Lomas High School ("Las Lomas HS"), in the Acalanes Union High School District ("Acalanes"). AR 605, 607. When he started ninth grade at Las Lomas HS, S.H. was receiving services pursuant to an IEP developed on February 27, 2014, when he was in eighth grade. *Id.* Acalanes held an annual IEP team meeting on March 25, 2015, in the spring of S.H.'s ninth grade year. AR 607. The IEP developed in connection with that meeting ("the March 25, 2015 IEP") described S.H.'s levels of performance, set forth goals and proposed a transition plan. AR 609. It offered as accommodations "use of notes for tests/assignments when needed and appropriate; use of calculator when needed and appropriate; flexible seating on tests; extended time on class assignments/tests; instructions repeated/rephrased; preferential seating; prompting and refocusing; and speech to text as an option when applicable." AR 610. It also offered specialized academic instruction for 50 minutes, one time each school day, language and speech services for 40 minutes a week (individual and group boxes were checked), college awareness for 30 minutes a month and career awareness for 30 minutes a month. *Id.* Mother did not consent to the March 25, 2015 IEP because she did not believe it met S.H.'s needs and did not sign it. AR 610, 778.

In May 2015, S.H. was diagnosed with Autism Spectrum Disorder. AR 610. Around this time, Mother filed a due process complaint against Acalanes seeking an independent educational evaluation ("IEE") at public expense. *Id.* That complaint was settled in June 2015, with Acalanes agreeing to pay for an IEE. *Id.* Mother selected Dr. Elea Bernou to perform the IEE and scheduled the evaluation to be conducted in the early fall of 2015, which was the earliest Dr. Bernou could complete it because she was already "booked" until the third week of August. AR 507, 610.

Also in the spring of 2015, Mother began looking for other options for S.H. because she felt that his placement at Acalanes was not working. AR 788. Around April 2015, S.H. applied to Orion Academy ("Orion"), a state-certified non-public school in Moraga California, and he was accepted in May. AR 610-611. The tuition for the 2015-2016 school year was $33,500. AR 611.

2

Mother entered into a tuition contract with Orion and by July 7, 2015, she had paid $19,230 in tuition, much of which S.H.'s grandmother had borrowed from her retirement fund to pay. *Id.* In November 2015 Mother entered into a payment plan for the remainder of the tuition, which was to be paid in installments in December 2015, February 2016 and March 2016. *Id.* To help pay for Orion and as part of an agreement with S.H.'s grandmother, Mother and S.H. moved to less expensive housing in Concord, California, in the Mt. Diablo Unified School District, on July 31, 2015. AR 612.

S.H. began school at Orion on August 6, 2015, when Orion's school year began. *Id.* This was during the summer break after the school year had ended in Acalanes and before the public high school in Mt. Diablo (Mt. Diablo High School, or "MDHS") had started. *Id.* At the recommendation of Dr. Kathryn Stewart, the executive director of Orion, S.H. was enrolled there as a ninth grader. AR 611-612.

The first day of school at MDHS was August 26 or 27, 2015. AR 612. A day or two before that, on August 24 or 25, 2015, Mother filled out registration paperwork to enroll S.H. at MDHS. AR 615. She checked a box indicating that S.H. was in special education. *Id.* Mt. Diablo asked for a copy of S.H.'s most recent IEP and Mother provided a copy of the March 25, 2015 IEP without a signature page. *Id.* It appears to be undisputed that Mother did not alert anyone at Mt. Diablo at that time that she had not consented to the March 25, 2015 IEP. AR 615. Nor is there any evidence in the record that Mt. Diablo asked Mother to supply the signature page or if she had consented to the March 25, 2015 IEP.

On August 25, 2015, Mother told the MDHS registrar that she had privately placed S.H. at Orion. AR 615. On August 27, 2015, Mother emailed several Mt. Diablo employees informing them that she had enrolled S.H. at MDHS and was requesting an IEP meeting to be conducted in October 2015. *Id.* She requested the October date so that Dr. Bernou's IEE would be complete by the time of the IEP meeting. AR 832. Apparently, MDHS employees believed that S.H. would begin attending MDHS at the commencement of school year, creating a schedule for him and initially marking him absent when he did not show up to school. AR 615-616. On September 4, 2015, the MDHS vice-principal, Nichole Hackett, contacted Mother to let her know that S.H. had

a schedule at MDHS that included two special education classes and two classes supported by special education staff. AR 616. Mother responded that she wanted to wait and see what services MDHS would be able provide so she could compare them with the services being provided at Orion before moving S.H. to MDHS. *Id*.

Dr. Bernou completed her written report on October 7, 2015. AR 617. Among other things, she recommended that S.H. receive 45 minutes per week of individual speech/language services and 45 minutes per week of group speech/language services. AR 257.

On October 14, 2015, Mt. Diablo held an IEP team meeting in order to consider Dr. Bernou's evaluation and develop interim placement and services for S.H. for a 30-day period. AR 621. In attendance were Mother, Dr. Bernou, Case Manager Dr. Beth Dela Cruz, Ms. Hackett, and school psychologist Jennifer Steinbeck. AR 140. Because Mt. Diablo considered the meeting to be an interim IEP meeting, the team did not address S.H.'s goals. AR 1084. No general education teacher participated in the meeting, and Mother and Ms. Hackett signed a form stating, in part:

> By mutual agreement between the parent/adult student, and designated representative of the local education agency, the presence and participation of the Individual Education Program team member(s) identified below is/are not necessary and has/have been excused from being present and participating in the meeting scheduled on 10/14/15 because (1) the member's area of the curriculum or related services is not being modified or discussed in the meeting or (2) the meeting involves a modification to or discussion of the member's area or related services and the member submitted, in writing to the parent and the IEP team, input into the development of the IEP prior to the meeting.

AR 144. Handwritten in the space left for listing the names of the missing team members was written: "Regular education teachers have been excused due to no definite class schedule." *Id*.

The IEP team decided to offer S.H. the services and placement in the March 25, 2015 IEP with some modifications based on Dr. Bernou's evaluation. AR 621. Under the heading "Offer of Services by MDHS" a list of bullet points described the services to be provided. AR 141. One of the bullet points states: "Speech and Language: 40 minutes a week" without any elaboration as to whether this instruction would be in a group or individual setting. *Id*. The IEP states that the team planned to hold another IEP team meeting "to give Mom time to further consider options – from MDHS and from Orion." AR 142. Mother did not consent to the October 14, 2015 IEP ("Interim

1  IEP").

2      On October 21, 2015, S.H.'s attorney sent a "Notice of Intent to Place at Orion Academy."

3  AR 348. That letter states that Mt. Diablo's "current offer of placement . . . is not appropriate."

4  *Id.* The letter further informed Mt. Diablo that S.H. would remain at Orion and that Mother would

5  "seek reimbursement from the district for the costs of this appropriate program." *Id.* The next

6  day, Mother filed a due process hearing request with the Office of Administrative Hearings

7  ("OAH"). AR 603.

8      The following issues were raised in S.H.'s due process request:

9
10      Student's Issue I: Did Mt. Diablo commit the following procedural violations, which denied Student a free appropriate public education for the 2015-2016 school year:

11
12      a. failing to make a formal, specific written offer of [free appropriate public education ("FAPE")] in the October 14, 2015 individualized education program document;

13      b. failing to include any goals in the October 14, 2015 IEP document;
14

15      c. only offering Student interim services in the October 14, 2015 IEP; and

16      d. failing to have all required IEP team members present at the October 14, 2015 IEP meeting?
17

18      Student's Issue 2: Did Mt. Diablo deny Student a FAPE in the October 14, 2015 IEP, designated as an interim IEP by Mt. Diablo, by failing to offer Student an appropriate placement?
19

20  AR 603-604. The OAH issued a decision on May 2, 2016 in which it found in favor of S.H. on

21  issues 1.a and 1.d and in favor of Mt. Diablo on the remaining issues. AR 603-639.

22      In the instant motions, each side seeks summary judgment on the issues on which it did not

23  prevail in the administrative proceeding. In particular, S.H. asks the Court to hold on summary

24  judgment that Mt. Diablo acted unlawfully when it completed an interim IEP that did not include

25  any goals in October 2015 and that Mt. Diablo denied S.H. a FAPE by doing so. Mt. Diablo, in

26  turn, asks the Court to hold that the interim IEP offer of speech and language services was

27  sufficient (Issue 1.a) and that it was lawful for Mt. Diablo to hold the October 14, 2015 team

28  meeting without the participation of a general education teacher (Issue 1.d).

# III.    ANALYSIS

## A.    Statutory Background

Congress enacted the IDEA in order "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A). The IDEA defines "free and appropriate public education" as "special education and related services" that:

> (A) have been provided at public expense, under public supervision and direction, and without charge;
>
> (B) meet the standards of the State educational agency;
>
> (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and
>
> (D) are provided in conformity with the individualized education program required under section 1414(d) of this title.

20 U.S.C. § 1401(9).

The IDEA establishes a framework in which parents and schools engage in a cooperative process culminating in the creation of an IEP for every disabled student. 20 U.S.C. § 1414; *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 53 (2005). "Each IEP must include an assessment of the child's current educational performance, must articulate measurable educational goals, and must specify the nature of the special services that the school will provide." *Schaffer*, 546 U.S. at 53. The IEP must be "reasonably calculated to enable the child to receive educational benefits." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley* ("*Rowley*"), 458 U.S. 176, 207 (1982). Further, in order to provide special education services under an IEP, the school district must obtain the informed consent of the child's parents. 20 U.S.C. § 1414(a)(1)(D). Parents may also revoke consent to the receipt of special education services if they do so in writing. 34 C.F.R. § 300.9; Cal. Educ. Code § 56021.1.

Under the IDEA, the IEP is developed by an "IEP Team." *See* 20 U.S.C. § 1414(d)(1)(B). The IEP team includes "the parents of a child with a disability;" "not less than 1 regular education teacher of such child (if the child is, or may be, participating in the regular education environment);" "not less than 1 special education teacher, or where appropriate, not less than 1

special education provider of such child;" "a representative of the local educational agency;" "an individual who can interpret the instructional implications of evaluation results, who may be a member of the team" described above, "whenever appropriate, the child with a disability." *Id.*; *see also* 34 C.F.R. § 300.321. The IDEA provides, however, that "[a] member of the IEP Team shall not be required to attend an IEP meeting, in whole or in part, if the parent of a child with a disability and the local educational agency agree that the attendance of such member is not necessary because the member's area of the curriculum or related services is not being modified or discussed in the meeting." 20 U.S.C. § 1414(d)(1)(C)(i). In the alternative, "[a] member of the IEP Team may be excused from attending an IEP meeting, in whole or in part, when the meeting involves a modification to or discussion of the member's area of the curriculum or related services, if . . .the parent and the local educational agency consent to the excusal; and . . . the member submits, in writing to the parent and the IEP Team, input into the development of the IEP prior to the meeting." 20 U.S.C. § 1414(d)(1)(C)(ii). Under both of these provisions, the parent must agree in writing that the participation of the IEP team member is not required. 20 U.S.C. § 1414(d)(1)(C)(iii).

The IEP "is a written statement for each individual with exceptional needs that is developed, reviewed, and revised in accordance with [state educational standards], as required by Section 1414(d) of Title 20 of the United States Code." Cal. Educ. Code § 56345(a). It must include: 1) "[a] statement of the individual's present levels of academic achievement and functional performance . . . ;" 2) "[a] statement of measurable annual goals, including academic and functional goals . . .;" 3) "[a] description of the manner in which the progress of the pupil toward meeting the annual goals . . . will be measured and when periodic reports on the progress the pupil is making . . .will be provided . . . ;" 4) "[a] statement of the special education and related services and supplementary aids and services . . . to be provided . . . and a statement of the program modifications or supports for school personnel that will be provided" so that the student can attain annual goals; 5) "[a]n explanation of the extent, if any, to which the pupil will not participate with nondisabled pupils in the regular class" or activities; 6) "[a] statement of individual appropriate accommodations that are necessary to measure the academic achievement

and functional performance of the pupil on state and districtwide assessments"; 7) "[t]he projected date for the beginning of the services and modifications" to be offered under the IEP; and 8) "[b]eginning not later than the first individualized education program to be in effect when the pupil is 16 years of age, or younger if determined appropriate by the individualized education program team, and updated annually thereafter . . .[a]ppropriate measurable postsecondary goals based upon age-appropriate transition assessments related to training, education, employment and where appropriate, independent living skills." *Id.*; *see also* 34 C.F.R. § 300.320(a).

Under the IDEA, "[a]t the beginning of each school year, each local educational agency, State educational agency, or other State agency, as the case may be, shall have in effect, for each child with a disability in the agency's jurisdiction, an individualized education program . . . ." 20 U.S.C. § 1414(d)(2)(A).

The time allowed to complete an IEP depends on the student's circumstances. Under the California Education Code:

> An individualized education program required as a result of an assessment of a pupil shall be developed within a total time not to exceed 60 days, not counting days between the pupil's regular school sessions, terms, or days of school vacation in excess of five schooldays, from the date of receipt of the parent's written consent for assessment, unless the parent agrees, in writing, to an extension. However, an individualized education program required as a result of an assessment of a pupil shall be developed within 30 days after the commencement of the subsequent regular school year as determined by each local educational agency's school calendar for each pupil for whom a referral has been made 30 days or less prior to the end of the regular school year. In the case of pupil school vacations, the 60-day time shall recommence on the date that pupil schooldays reconvene. A meeting to develop an initial individualized education program for the pupil shall be conducted within 30 days of a determination that the pupil needs special education and related services pursuant to Section 300.323(c)(1) of Title 34 of the Code of Federal Regulations.

Cal. Educ. Code § 56344(a).

Notwithstanding these requirements, the IDEA allows school districts to perform an "interim IEP" when a student transfers mid-year from one school district to another and has an IEP in effect at the time of the transfer. In particular, it provides as follows:

**(C) Program for children who transfer school districts**

8

**(i) In general**

**(I) Transfer within the same State**

In the case of a child with a disability who transfers school districts within the same academic year, who enrolls in a new school, and who had an IEP that was in effect in the same State, the local educational agency shall provide such child with a free appropriate public education, including services comparable to those described in the previously held IEP, in consultation with the parents until such time as the local educational agency adopts the previously held IEP or develops, adopts, and implements a new IEP that is consistent with Federal and State law.

20 U.S.C. § 1414(d)(2)(C)(i)(I) ("interdistrict transfer provision"). The California Education Code includes a provision that mirrors the federal provision and further provides that for a student who transfers into a district not operating under the same special education local plan area, the local educational agency ("LEA") shall provide the interim program "for a period not to exceed 30 days," by which time the LEA shall adopt the previously approved IEP or shall develop, adopt, and implement a new IEP that is consistent with federal and state law. Cal. Educ. Code § 56325(a)(1). To facilitate the transfer process, "the new public agency in which the child enrolls must take reasonable steps to promptly obtain the child's records, including the IEP and supporting documents and any other records relating to the provision of special education or related services to the child, from the previous public agency in which the child was enrolled." 34 C.F.R. § 300.323(g)(1). Similarly, "the previous public agency in which the child was enrolled must take reasonable steps to promptly respond to the request from the new public agency." 34 C.F.R. § 300.323(g)(2).

The IDEA and the California Education Code also impose obligations on school districts to identify children with special needs, referred to as "child find" rules. The California Education Code provides that local educational agencies must "actively and systematically seek out all individuals with exceptional needs, from birth to 21 years of age, inclusive, including children not enrolled in public school programs, who reside in a school district . . . ." Cal. Educ. Code § 56300. Similarly, the IDEA "child find" provision requires that "[a]ll children with disabilities residing in the State, including children with disabilities who are homeless children or are wards of the State and children with disabilities attending private schools, regardless of the severity of

their disabilities, and who are in need of special education and related services, are identified, located, and evaluated and a practical method is developed and implemented to determine which children with disabilities are currently receiving needed special education and related services." 20 U.S.C. § 1412(a)(3).

The IDEA requires that state education agencies "establish and maintain procedures . . . to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a free appropriate public education by such agencies." 20 U.S.C.A. § 1415(a). The procedural safeguards required under this section include "[w]ritten prior notice to the parents of the child . . . whenever the local educational agency . . . proposes to initiate or change . . .the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to the child." 20 U.S.C. § 1415(b)(3). The Ninth Circuit has explained that this "formal requirement has an important purpose that is not merely technical . . . and should be enforced rigorously." *Union School Dist. v. Smith*, 15 F.3d 1519, 1526 (9th Cir. 1994). In particular, the court in *Smith* explained:

> The requirement of a formal, written offer creates a clear record that will do much to eliminate troublesome factual disputes many years later about when placements were offered, what placements were offered, and what additional educational assistance was offered to supplement a placement, if any. Furthermore, a formal, specific offer from a school district will greatly assist parents in "present[ing] complaints with respect to any matter relating to the ... educational placement of the child."

*Id*. (quoting 20 U.S.C. § 1415(b)).

Section 1415 further provides that "a hearing officer may find that a child did not receive a free appropriate public education" based on a procedural violation "only if the procedural inadequacies – (I) impeded the child's right to a free appropriate public education; (II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child; or (III) caused a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(e)(2).

**B.    Standard of Review**

"Under the IDEA, federal courts reviewing state administrative proceedings are to 'receive

the records of the administrative proceedings;' 'hear additional evidence at the request of a party;' and 'grant such relief as the court determines is appropriate' based on a preponderance of the evidence." *Amanda J. ex rel. Annette J. v. Clark Cty. Sch. Dist.*, 267 F.3d 877, 887–88 (9th Cir. 2001) (quoting 20 U.S.C. § 1415(i)(2)(B)). "Thus, judicial review in IDEA cases differs substantially from judicial review of other agency actions, in which courts generally are confined to the administrative record and are held to a highly deferential standard of review." *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1471 (9th Cir. 1993). Instead, "Congress intended courts to make bounded, independent decisions—bounded by the administrative record and additional evidence, and independent by virtue of being based on a preponderance of the evidence before the court." *Town of Burlington v. Department of Educ.*, 736 F.2d 773, 791 (1st Cir. 1984), aff'd sub nom. *Sch. Comm. v. Department of Educ.*, 471 U.S. 359 (1985). In making such decisions, courts should give "due weight" to state administrative proceedings and must not "substitute their own notions of sound educational policy for those of the school authorities which they review." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 206 (1982). While the level of deference that the court gives to the ALJ's findings is discretionary, it "increases where [the findings] are thorough and careful." *Capistrano Unified Sch. Dist. v. Wartenberg,* 59 F.3d 884, 891 (9th Cir.1995) (internal citations omitted).

### C. Whether OAH Erred in Finding that Mt. Diablo's Completion of an Interim IEP without Any Goals Was Lawful

#### 1. Background

Plaintiff contends the OAH erred in finding that Mt. Diablo acted lawfully when it completed an interim IEP for S.H. that borrowed from his earlier IEP and did not include any goals. His position turns on the question of whether Mt. Diablo properly treated S.H. as a transfer student subject to 20 U.S.C. § 1414(d)(2)(C)(i)(I) (quoted above). S.H. contends this section was not applicable to him because: 1) the provision applies only where a student transfers *during* the school year whereas S.H. registered to attend MDHS after the Acalanes school year had ended and before the Mt. Diablo school year began; 2) the provision applies only to transfers from one public school to another whereas S.H. was coming to MDHS from a non-public school where he

1   was privately placed by his mother; 3) the provision applies only to students who have an

2   operative IEP and S.H. had none, both because Mother had not consented to the March 25, 2015

3   IEP and because his private placement at Orion "got rid of" any previous IEP.

4         The OAH rejected S.H.'s arguments, finding that Mt. Diablo's completion of an interim

5   IEP was "reasonable" under the circumstances because it promoted the purposes of the IDEA and

6   was least likely to result in the denial of a FAPE.   AR 625 (citing *Doug v. Hawaii Dept. of Educ.*,

7   720 F.3d 1038 (9th Cir. 2013)).  The OAH reasoned that it was reasonable to treat S.H.'s

8   enrollment at MDHS as a mid-year transfer because Mother made clear that S.H. would not

9   actually be attending MDHS before the IEP meeting with Mount Diablo, regardless of whether he

10  was enrolled there prior to the start of school.  AR 628.  It rejected S.H.'s reliance on 20 U.S.C. §

11  1414(d)(2)(A) in support of the assertion the Mt. Diablo was required to convene an IEP meeting

12  immediately, finding that that section only required Mt. Diablo to provide services "without

13  delay" and that Mt. Diablo was doing so because it believed it had a copy of a recent, approved

14  IEP.

15        As to whether the transfer qualified as an inter-district transfer, OAH concluded that it was

16  reasonable to conclude that it was because the amount of time S.H. spent at Orion was "de

17  minimus."  AR 629.   If Mt. Diablo had not treated S.H. as a inter-district transfer student, the

18  OAH reasoned, "[t]his likely would have resulted in Mt. Diablo implementing either Student's

19  unsigned March 2015 IEP or Student's February 2014 signed IEP with outdated goals, and

20  without a transition plan and no requirement that the IEP team meet again until student's annual

21  IEP was due in March 2016."  *Id*.  Consequently, it found, treating S.H. as a transfer student was

22  less likely to result in a denial of FAPE than the alternative.  *Id.*

23        The OAH also rejected S.H.'s argument that because Mother placed him at Orion he was,

24  when he enrolled at MDHS, a student without an IEP and therefore was entitled to a new IEP.  AR

25  626.  The premise of S.H.'s argument, the OAH said, was that S.H.'s placement at Orion

26  constituted a de facto revocation of consent for special education.  *Id*.  In the alternative, S.H.

27  argued that when he enrolled at MDHS, Mt. Diablo's "child find" obligations were triggered,

28  which meant that Mt. Diablo either had to assess S.H. right away or hold an IEP meeting within 30

days. *Id.* The OAH rejected the first argument because revocation of consent to special education must be in writing. AR 627. More importantly, the OAH found that treating a unilateral placement as a de facto revocation of consent would be contrary to the IDEA, leading to the result that the school district would *never* be required to reimburse families whose children were privately placed because the private placement would, by itself, eliminate the school district's responsibility to provide FAPE. *Id.* Moreover, Mother's conduct was not consistent with an intent to withdraw S.H. from special education, the OAH found. *Id.*

### 2. Discussion

The OAH concluded that Mt. Diablo acted reasonably when it conducted an interim IEP instead of a complete IEP when S.H. enrolled at MDHS. The Court finds that the OAH incorrectly relied on a "reasonableness" standard that applies only where an educational agency is faced with conflicting obligations under the IDEA and state law, which was not the case here. Even if the reasonableness standard was applicable, Mt. Diablo's reliance on the interim IEP provision was not reasonable.

In *Doug C. v. Hawaii Department of Education*, the Ninth Circuit addressed the "difficult question" of "what a public agency must do when confronted with the difficult situation of being unable to meet two distinct procedural requirements of the IDEA." 720 F.3d 1038, 1046 (9th Cir. 2013). In that case, the alleged conflict was between the school district's obligation to conduct a timely IEP meeting and the obligation to ensure parental participation where the school district was having difficulty scheduling the meeting with the student's father and the deadline for completing the IEP was fast approaching. *Id.* at 1045. The school district chose the option of conducting the meeting without the father to meet the deadline. *Id.* The Ninth Circuit held that when a school district is faced with conflicting obligations, "the agency must make a reasonable determination of which course of action promotes the purposes of the IDEA and is least likely to result in the denial of a FAPE." *Id.* at 1046. In that case, the court concluded that the school district had acted *unreasonably* when it prioritized a deadline over parental participation, citing the emphasis by the Supreme Court and the Ninth Circuit on the importance of parental participation and the rule that a FAPE is not denied in cases of delay where the student is not deprived of any

educational benefit as a result of the delay. *Id.* The court also rejected the school district's assertion that the student's IEP would have "lapsed" when the IEP deadline passed, concluding that there was no authority for the proposition that the school district would have had to cease offering special education services on the date the IEP deadline expired. *Id.*

Here, the OAH relied on *Doug C.* for the proposition that "when confronted with the situation of complying with one procedural requirement of the IDEA or another, the agency must make a reasonable determination of which course of action promotes the purposes of the IDEA and is least likely to result in a denial of FAPE." AR 625. It did not, however, point to any actual conflict between obligations under the IDEA. Instead, it emphasized that the facts of this case presented a "very unusual situation not contemplated by the legislature or the courts." AR 628. Unusual or not, school districts are not given the discretion to pick and choose between applicable obligations (even in a manner that is reasonable) when they do not face an actual conflict. In reading *Doug C.* so broadly, the OAH impermissibly broadened the rule announced in that case.

Even if the reasonableness standard were correct, however, the application of the interdistrict transfer provision was not reasonable. On its face, that provision applies only to mid-year transfers. While the OAH suggested that S.H.'s situation had not been contemplated by the legislature, the United States Education Department's comments in the official comments to the 2006 Federal Regulations suggest otherwise. There, "the United States Department of Education addressed whether it needed to clarify the regulations regarding the responsibilities of a new school district for a child with a disability who transferred during summer." *In the Matter of Parent on behalf of Student v. Los Virgenes Unified School District*, OAH Case. No. 2013110490, p. 14 (citing 71 Fed. Reg. 46682 (August 14, 2006)). The comments state as follows:

> Comment: A few commenters requested clarification regarding the responsibilities of the new public agency for a child with a disability who moves during the summer.

> Discussion: Section 614(d)(2)(a) is clear that at the beginning of each school year, each LEA, SEA, or other State agency, as the case may be, must have an IEP in effect for each child with a disability in the agency's jurisdiction. Therefore, public agencies need to have a means for determining whether children who move into the State during the summer are children with disabilities and for ensuring that an IEP is in effect at the beginning of the school year.

71 Fed. Reg. 46682 (August 14, 2006)). Thus, it is clear that the interdistrict transfer provision only applies "in the case of a transfer within the same academic year that [the child] was in the previous district." *Los Virgenes, OAH Case* No. 2013110490, p. 14.

Further, neither Mt. Diablo nor the OAH cite any authority for the proposition that S.H.'s time at Orion may be ignored, for the purposes of determining whether the transfer was "inter-district" because his time there was "de minimis." Indeed, this conclusion is arguably inconsistent with Mt. Diablo's earlier argument that the transfer could be considered "mid-year" because S.H. was attending Orion at the beginning of the school year rather than MDHS and thus did not actually attend MDHS when the school year began.

Most troubling, though, is the OAH's conclusion that it was reasonable for Mt. Diablo to apply a provision that is aimed at students who have an IEP in effect and then to rely on that provision to create an interim IEP based on an invalid IEP. As a preliminary matter, the Court agrees with the conclusion of the OAH that Mother did not withdraw S.H. from special education at any time relevant to this action. She did not withdraw consent in writing, as required under the IDEA and the California Education Code, and she demonstrated by her conduct that at all relevant times she was seeking special education services, diligently seeking to obtain an IEP for S.H. in his new school district so that she could compare the services offered there with the ones he was receiving at Orion. Nonetheless, the March 25, 2015 IEP lacked consent and therefore could not be used as a basis for providing interim services or developing an interim IEP.

OAH places great emphasis on the fact that Mother failed to alert Mt. Diablo that she had not consented to the March 25, 2015 IEP in support of its conclusion that Mt. Diablo acted reasonably. AR 628-629. In doing so, it placed on Mother the responsibility for ensuring that Mt. Diablo had S.H.'s file and a complete copy of his IEP. Under the IDEA, however, that burden falls squarely on the shoulders of the school district, which has a responsibility to make reasonable efforts to obtain student's IEP and records from the prior school district and to determine whether S.H. had a valid IEP. When Mt. Diablo received an IEP without a signature page from Mother, it was on notice that the IEP may not have been consented and was required to make reasonable efforts to obtain records from Acalanes that would have allowed it to determine whether the IEP

15

was valid.  Having failed to do so, it was not reasonable to rely on an invalid IEP.[1]  Further, the OAH's conclusion that Mt. Diablo's conduct was reasonable because of Mother's conduct amounts to the sort of shifting of blame to parents that the Ninth Circuit has found to be improper.  *Doug C. v. Hawaii Dep't of Educ.,* 720 F.3d at 1045 (9th Cir. 2013)("We have consistently held that an agency cannot eschew its affirmative duties under the IDEA by blaming the parents.").[2]

The Court finds that the OAH erred in concluding that Mt. Diablo did not violate the IDEA and the California Education Code when it treated him as a transfer student and completed an interim IEP that did not include goals – or any description of how the achievement of those goals would be measured  –  as required under Cal. Educ. Code  section 56345(a) and  20 U.S.C. § 1400(d)(1)(A).

**D.    Whether the OAH Erred in Concluding that Mt. Diablo Did not Comply With the Formal Written Offer Requirement**

**1.  Background**

In the October 14, 2015 IEP, one of the services offered was described as "speech and language: 40 minutes a week."  AR 141.  As discussed above, Dr. Bernou had recommended that S.H. receive 45 minutes per week of individual speech/language services and 45 minutes per week of group speech/language services.  AR 257.  In the administrative proceeding, S.H. argued that this offer of services did not comply with the IDEA's "formal, written offer" requirement, and the

---

[1] The Court notes that the application of the reasonableness standard of *Doug C.* is based on the actions taken by the school district in light of the legal obligations imposed on it under state and federal law, not the good faith of the individuals involved in the special education process.  Here, it appears that school district staff made an understandable mistake when they assumed that the March 25, 2015 IEP was valid, overlooking the lack of a signature page showing consent.  The result of that mistake, however, was what the Court finds to be a fairly serious procedural violation whereby the school district used an invalid IEP as a starting point for determining the services it would offer S.H.

[2] Mt. Diablo suggests that if it had not relied on the March 25, 2015 IEP that lacked consent it would have had to resort to relying on the February 2014 IEP (to which Mother had consented), which would have been less likely to accomplish the objectives of the IDEA than completing an interim IEP based on the invalid March 25, 2015 IEP.  What the school district *might hypothetically* have done, or whether reliance on the 2014 IEP would have been lawful are not before the Court.  In any event, Mt. Diablo fails to acknowledge that there was also another possible hypothetical scenario, namely, the prompt assessment of S.H. and the development of a new, complete IEP. Presumably, that result would have been *more* likely to accomplish the goals of the IDEA than the course that Mt. Diablo followed.

1    OAH agreed. AR 28-29.

2         The OAH found that the "formal written offer" requirement must be enforced

3    "rigorous[ly]" under *Union School District v. Smith* ("*Union*"), 15 F.3d 1519 (1994) and noted

4    that while *Union i*nvolved a school district's failure to make *any* formal written offer, many courts

5    have relied on *Union* to invalidate IEPs that "though offered, were insufficiently clear and

6    specific to permit parents to make an intelligent decision whether to agree, disagree, or seek relief

7    through a due process hearing." AR 630 (citing *A.K. v. Alexandria City School Bd.*, 484 F.3d 672,

8    681 (4th Cir. 2007); *Knable v. Bexley School Dist.*, 238 F.3d 755, 769 (6th Cir. 2001); *Bend*

9    *LaPine School Dist. v K.H.*, No. 04-1468, 2005 WL 1587241 (D. Ore. June 2, 2005); *Glendale*

10   *Unified School Dist. v. Almasi*, 122 F. Supp. 2d 1093, 1108 (C.D. Cal. 2000); *Mill Valley Elem.*

11   *School Dist. v. Eastin*, No. 98-03812, 32 IDELR 140, 32 LPR 6046 (N.D. Cal., Oct. 1, 1999);

12   *Marcus I. v. Dept. of Educ.*, No. 10-00381, 2011 WL 1833207 (D. Hawai'i, May 9, 2011)).

13   Likewise, the OAH found that because of the failure to specify in the October 14, 2015 IEP

14   whether the speech and language services that were being offered would be delivered individually

15   or in a group, the IEP was "not sufficiently clear . . . because there was a request from parent for

16   both and there was only one session offered and the IEP does not indicate whether it was group or

17   individual." AR 631. The OAH noted that "even after a full hearing, the evidence did not

18   establish whether the services were individual or group." *Id.* The OAH found that "[w]ithout the

19   information regarding the character of the speech and language services, especially because Dr.

20   Bernou had recommended both individual and group speech and language services, Mother's

21   ability to participate was impaired," resulting in a denial of FAPE to S.H. from October 14, 2015.

22   *Id.*

23        In its summary judgment motion, Mt. Diablo argues that the OAH erred, applying a

24   "narrow and hyper-technical" reading of *Union* and its progeny "which abrogates [Mt. Diablo's]

25   fundamental discretion to choose the methodology of instruction and services." Dkt. No. 28 at 7.

26   First, it argues that the rule announced in *Union* has been applied mainly to lack of specificity in

27   offers of placement. *Id.* at 16 (citing *Bookout v. Bellflower Unified Sch. Dist.*, No.CV 13-2710-

28   SH, 2014 WL 1152948, at *8 (C.D. Cal. Mar. 21, 2014; *J.P. ex rel. Popowitz v. Los Angeles*

*Unified Sch. Dist.*, No. CV 09-01083 MMM MANX, 2011 WL 12697384, at \*21 (C.D. Cal. Feb. 16, 2011); *A.B. v. San Francisco Unified Sch. Dist.*, No. C07-4738PJH, 2008 WL 4773417, at \*15 (N.D. Cal. Oct. 30, 2008); *Redding Elementary Sch. Dist. v. Goyne*, No. CIV. S001174WBSGGH, 2001 WL 34098658, at \*5 (E.D. Cal. Mar. 6, 2001); *Glendale Unified Sch. Dist. v. Almasi*, 122 F. Supp. 2d 1093, 1107 (C.D. Cal. 2000)). Even in that context, Mt. Diablo contends, lack of specificity may be harmless where the parent understands the offer in fact. *Id.* (citing *B.M. ex rel. R.M. v. Encinitas Union Sch. Dist.*, No. 08CV412-L JMA, 2013 WL 593417, at \*12 (S.D. Cal. Feb. 14, 2013); *A.B.,* 2008 WL 4773417, at \*15). According to Mt. Diablo, that is the case here. *Id.*

According to Mt. Diablo, few cases have applied the rule of *Union* beyond offers of placements, and those few have reached different conclusions. *Id.* at 26-17 (comparing *Bend v. LaPine Sch. Dist. v. K.H.* with *Dept. of Educ., Hawai'i v. C.B. ex rel. Donna B.*, No. CIV. 11-00576 SOM, 2012 WL 1537454, at \*11 (D. Haw. May 1, 2012)). Mt. Diablo contends *Union* "has not been extended to require exacting specificity in all aspects of an IEP offer; even when the offer provides some uncertainty." *Id.* at 17 (citing *Jack P. v. Auburn Union Elementary Sch. Dist.*, No. S-04-896 LKK/PAN, 2005 WL 2042269, at \*20 (E.D. Cal. Aug. 23, 2005)). Rather, it asserts, some "background confusion" does not render an offer fatally unspecific. *Id.* Mt. Diablo also argues that the services that were offered here can be construed as "as needed" and therefore it is not reasonable to expect it to predict the amount of time S.H. would have actually accessed the services. *Id.* (citing *J.L. v. Mercer Island Sch. Dist.*, 592 F.3d 938, 953 (9th Cir. 2010)).

Mt. Diablo argues further that the OAH's conclusion undermines its "methodological discretion" because it has inherent discretion to determine the method of delivering speech and language instruction to S.H. *Id.* at 17-19 (citing *M.D. v. Hawaii, Dep't of Educ.*, 864 F. Supp. 2d 993 (D. Haw. 2012)).

### 2. Discussion

Mt. Diablo contends the OAH erred in its application of *Union*, reading the case too broadly to extend beyond offers of placement to offers of services. Even if that case were applicable, according to Mt. Diablo, the facts here don't support a finding that there was a

18

violation because: 1) Mother actually understood the offer that was made; 2) any confusion was merely "background confusion"; and 3) the offer was for "as needed" services. It also argues that the OAH's approach was incorrect because it had discretion as to the method of delivering services. The Court finds all of these arguments to be unpersuasive.

First, the Court rejects Mt. Diablo's assertion that the rigorous approach to notice adopted in *Union* is limited to offers of placement. Under 20 U.S.C. § 1415(b)(3), parents are entitled to "[w]ritten prior notice" when the school district "proposes to initiate or change . . .the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to the child." 20 U.S.C. § 1415(b)(3). In *Union*, the Ninth Circuit explained that this "formal requirement has an important purpose that is not merely technical . . . and should be enforced rigorously." *Union School Dist. v. Smith*, 15 F.3d 1519, 1526 (9th Cir. 1994). In particular, the court in *Union* explained:

> The requirement of a formal, written offer creates a clear record that will do much to eliminate troublesome factual disputes many years later about when placements were offered, what placements were offered, and what additional educational assistance was offered to supplement a placement, if any. Furthermore, a formal, specific offer from a school district will greatly assist parents in "present[ing] complaints with respect to any matter relating to the . . . educational placement of the child."

*Id.* (quoting 20 U.S.C. § 1415(b)).

Although *Union* involved an offer of placement, the reasoning of the case applies equally to offers of services and courts have regularly applied the rigorous approach of that case to such offers, as noted by the OAH. *See, e.g., Knable ex rel. Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 769 (6th Cir. 2001)(holding that IEP violated procedural requirements of IDEA where it contained only "generalized proposal of behavioral and educational goals for [student], with minimal details describing how the [proposed educational program] would help [student] meet such goals"); *Bend LaPine Sch. Dist. v. K.H.*, No. CIV. 04-1468-AA, 2005 WL 1587241, at *10 (D. Or. June 2, 2005), aff'd sub nom. *Bend-Lapine Sch. Dist. v. K.H.*, 234 F. App'x 508 (9th Cir. 2007) (holding that IEP behavior plan providing for specially designed instruction "throughout the school day" was "vague and indefinite and fail[ed] to make clear to parents or other IEP team

members the District's specific commitment of resources" and therefore violated the IDEA).

While Mt. Diablo has pointed to a series of cases that involved challenges to placement offers, none of those cases held that *Union* does *not* apply to the description of the services offered in the IEP. Indeed, the discussion of *Union*'s requirements in these cases frequently recognize, at least implicitly, that *Union* encompasses not only the placement but also the services that will be provided to the student by different programs. *See, e.g., Bookout v. Bellflower Unified Sch. Dist.*, No. CV 13-2710-SH, 2014 WL 1152948, at *10 (C.D. Cal. Mar. 21, 2014) (holding that school district's "failure to identify a specific [mild-to-moderate special day class] classroom location in its offer, constituted the failure to offer a specific educational placement" under the IDEA); *J.P. ex rel. Popowitz v. Los Angeles Unified Sch. Dist.*, No. CV 09-01083 MMM MANX, 2011 WL 12697384, at *23 (C.D. Cal. Feb. 16, 2011) (holding that the school district's offer of "various types of classrooms, located at a number of different school sites, with varying school-day durations" did not comport with *Union*); *A.B. v. San Francisco Unified Sch. Dist.*, No. C07-4738PJH, 2008 WL 4773417, at *15 (N.D. Cal. Oct. 30, 2008) (holding that a "clear written offer" had not been made where the applicable IEP for the relevant period did not document "the specifics of the program").

Second, while it is true that a procedural violation may be harmless where parents actually understand an offer of placement, *see, e.g., B.M. ex rel. R.M. v. Encinitas Union Sch. Dist.*, No. 08CV412-L JMA, 2013 WL 593417, at *11 (S.D. Cal. Feb. 14, 2013), Mt. Diablo's conclusory assertion that Mother actually understood the offer at issue here is not supported by any citation to the record and is belied by the OAH's comment that even after a full hearing it could not determine what services Mt. Diablo was offering with respect to whether the speech/language services offered in the IEP would be in a group or individual setting.

Nor is the Court persuaded that the vagueness of the offer is merely "background confusion" as was found in *Jack P. v. Auburn Union Elementary Sch. Dist.*, No. S-04-896 LKK/PAN, 2005 WL 2042269, at *20 (E.D. Cal. Aug. 23, 2005)) as the facts of that case are distinguishable. In *Jack P.*, the IEP offered a specified number of minutes of one-to-one instruction student would receive during the extended school year but school administrators

testified that the amount of time devoted to one-to-one instruction might end up being somewhat higher due to factors that were not entirely predictable. *Id.* The court acknowledged that there was "some information that the District would have had trouble providing at the time (for example, they had not yet hired the teacher and were not sure of the number of other students that would be enrolled in the summer program)" and that the IEP could have been more specific. *Id.* It concluded, however, that the IEP was sufficiently specific to meet the IDEA's procedural requirements because it contained a basic offer, noting that the special education coordinator was "not entirely sure of the details of what would be provided to [student] during the ESY and extended ESY, but that she was prepared to offer, at a minimum, that which was indicated in the IEP." *Id.* Under these circumstances, the court concluded that although the offer could have been more specific, any confusion caused by the testimony of the school district employees was merely "background confusion" that did not amount deprive student of a formal written offer. *Id.*

Under the facts here, in contrast to the circumstances in *Jack P.*, the confusion was not "background confusion" relating to services that might be provided *in addition* to those specified in the IEP. Rather, the confusion related to the basic offer described in the IEP itself. Without any explanation of what type of speech and language services Mt. Diablo was offering in the October 14, 2015 IEP, the confusion caused by the lack of specificity deprived Mother of her right to meaningfully participate in the IEP process. In particular, Dr. Bernou had made specific recommendations as to the type of speech and language services S.H. should receive; the IEP offered by Mt. Diablo, however, did not provide sufficient information for Mother to evaluate the school district's offer of services in light of Dr. Bernou's recommendations. Therefore, the Court concludes that the OAH properly found that the offer of speech/language services in the October 14, 2015 IEP did not meet the formal written offer requirement.[3]

---

[3] The Court also rejects Mt. Diablo's argument that the offer could be understood as an offer of "as needed services" and therefore it was reasonable to omit specific details describing the type of services being offered. In the first place, the OAH did not address this argument, which Mt. Diablo apparently did not raise in the administrative proceeding. Even assuming it is appropriate for this Court to reach an argument that was not raised in the administrative proceeding, there is nothing in the record to support the conclusion that the offer of speech/language services in the October 14, 2015 IEP was intended to be on an as-needed basis. Thus, Mt. Diablo's reliance on *J.L. v. Mercer Island Sch. Dist.*, 592 F.3d 938, 953 (9th Cir. 2010) is misplaced. In that case, the

Finally, the Court rejects Mt. Diablo's assertion that the OAH's conclusion impairs its discretion as to methodology of instruction. In *Rowley*, the Supreme Court held that [t]he primary responsibility for formulating the education to be accorded a handicapped child, and for choosing the educational method most suitable to the child's needs, was left by the [IDEA] to state and local educational agencies in cooperation with the parents or guardian of the child." 458 U.S. at 207. Applying that rule, the court in *M.D. v. Hawaii, Department of Education*, found that an IEP that provided for a total amount of speech/language services without specifying how much time would be devoted to each type of service did not deprive the student of a FAPE, concluding that the specific mix of services was a question that fell within the discretion of the school district. 864 F. Supp. 2d 993, 1005 (D. Haw. 2012). While superficially similar to the situation here, the Court concludes that the facts of that case are distinguishable.

In contrast to this case, the parents in *M.D.* did not assert that the IEP did not meet the formal written offer requirement as to speech/language services. Instead, they asserted that the IEP, as written, was so open-ended that it allowed for the provision of "any amount of direct speech therapy, or no actual speech therapy," thus repudiating the IEP team's agreement on the frequency of speech therapy and procedurally and substantively denying Student a FAPE. *Id.* at 1005. The court, however, found that the student received *more* than the total amount of services required under the IEP, the vast majority of which was provided in the form of direct services. *Id.* It also cited the testimony of the speech-language pathologist, who explained the importance of keeping "options open because conversation, language, speech is a very, very dynamic, ingenerative [sic] discipline." *Id.* This testimony supported the conclusion that the IEP offer of

---

IEP listed a lump-sum number of minutes for a variety of accommodations, including "access to books on tape, access to a peer note taker and word processing software, extended time for tests and assignments, alternative exam methods, preferential seating and scheduling, and use of a calculator and literacy software." *Id* The court held that "the allocation of a specific number of minutes to any of [the] accommodations would make no sense because they are all access-based modifications" and "[p]resumably, [student] had unlimited access to each of the . . . accommodations." *Id.* In that context, the court found that the IEP was not insufficiently specific. *Id.* The court recognized, however, that "a lump-sum number like this may not be appropriate in other individualized educational programs" where the accommodations are not access-based. *Id.* There is nothing in the record to suggest that Mt. Diablo intended to offer S.H. unlimited speech/language services and this aspect of the IEP is not "access-based."

services was deliberately somewhat open-ended as to the type of services to be offered for methodological reasons. In contrast, there is nothing in the record of this case that supports the conclusion that the failure to specify whether services would be offered in a group or individual setting was a methodological choice based on educational considerations. Therefore, the Court rejects Mt. Diablo's assertion that its failure to specify the type of services being offered was a permissible exercise of discretion.

### E. Whether the OAH Erred in Concluding that Mt. Diablo Was Required to Have a General Education Teacher Present at the October 14, 2015 IEP Meeting

#### 1. Background

As discussed above, no general education teacher participated in the October 14, 2015 IEP team meeting, where the team addressed the recommendations of Dr. Bernou and made some modifications to the March 25, 2015 IEP. Mother signed a consent form excusing the participation of a general education teacher on the basis that "(1) the member's area of the curriculum or related services is not being modified or discussed in the meeting or (2) the meeting involves a modification to or discussion of the member's area or related services and the member submitted, in writing to the parent and the IEP team, input into the development of the IEP prior to the meeting." AR 144. The reason for failing to include a general education teacher expressed in handwritten note on the form was that S.H. had "no definite class schedule." *Id*.

In the administrative proceeding, Mt. Diablo asserted that because it was making only a 30-day interim placement offer, it was not required to conduct a full-fledged team meeting that included all of the IEP team members. AR 81. The OAH disagreed, however, concluding that S.H. was entitled to have the entire IEP team present because the meeting involved not just the making of a 30 day interim offer but also consideration of the IEE results and modifications of the March 25, 2015 IEP based on those results. AR 632. In that context, the OAH found that S.H. was denied a FAPE, notwithstanding Mother's consent, because neither of the provisions excusing a team member from participation in an IEP team meeting applied. AR 632. In particular, the hearing officer found, the IEE presented by Dr. Bernou at the meeting was "relevant to serving student in both the special education and general education environments" *and* no written input

was provided by a general education teacher.  *Id.*

 In its summary judgment motion, Mt. Diablo argues that neither the making of a 30-day interim offer nor the consideration of Dr. Bernou's findings would "necessarily directly address or modify the curriculum of any of S.H.'s general education teachers" and therefore, that Mother's consent to hold the IEP team meeting without a general education teacher present was valid and permissible under the IDEA.  Docket No. 28 at 20.   Mt. Diablo further contends the OAH erred because it did not conduct a harmless error analysis to determine whether the absence of a general education teacher denied S.H. a FAPE.  *Id.* at 21 (citing *Amanda J. ex rel. v. Clark Cty. Sch. Dist.*, 267 F.3d 877, 892 (9th Cir. 2001)).  Here, Mt. Diablo contends, there is no evidence that the absence of a general education teacher "seriously infringe[d]" Mother's ability to participate in the IEP development process.  *Id.*   In particular, it asserts, Mother did not point to any information she wanted to obtain from a general education teacher that other team members could not provide such that her decision about S.H.'s placement was impaired.  *Id.*  In any event, it asserts, Mother had no intention of placing S.H. at MDHS and therefore, the failure to include a general education teacher could not have seriously infringed her rights.  *Id.*

 S.H. argues that the Court should not consider Mt. Diablo's assertion that a general education teacher was not required at the October 14, 2015 IEP meeting because it did not raise this argument in the administrative proceeding.  Docket No. 33 at 8-9.  Even if the Court considers the argument, it fails, according to S.H., because a team member must participate (or provide written input) even if that member's area of the curriculum is only *discussed* under the IDEA.  *Id.* at 9 (citing 34 C.F.R. § 300.321(e)(1)).  S.H. contends that because the interim offer increased the time to be devoted to "specialized academic instruction" from 100 minutes a day to 177 minutes a day, thereby reducing the time S.H. spent in general education classes, the IEP team had to discuss matters relevant to a general education teacher's area of the curriculum.  *Id.* at 10.

 S.H. also argues that Mt. Diablo acted improperly by misrepresenting the law to Mother on the excusal form, suggesting that it need not include a general education teacher where there was no definite class schedule.  *Id.* at 11.  That is not a correct statement of the law, S.H. asserts, as a general education teacher who participated in the IEP meeting could have been any teacher who

might have been S.H.'s teacher. *Id.* (citing *R.B. v. Napa Valley Unified Sch. Dist.*, 496 F.3d 932, 939 (9th Cir. 2007)).

S.H. rejects Mt. Diablo's assertion that the OAH erred because the failure to include a general education teacher was, at most, harmless error under *Amanda J*. *Id.* at 11. S.H. contends the Ninth Circuit declined to apply the harmless error analysis of *Amanda J*. in a case involving facts similar to those of this case, finding that the failure to include a general education teacher at the IEP team meeting was such a "critical structural defect" that it was not appropriate to conduct a harmless error analysis that asks whether the student was denied a FAPE as a result of the absence of the team member. *Id.* at 11-12 (citing *M.L. v. Fed. Way Sch. Dist.*, 387 F.3d 1101, 1116 (9th Cir. 2004)).

Nor is it appropriate to rely on Mother's intent to enroll S.H. at MDHS to determine whether there was harmless error, S.H. asserts. *Id.* at 13 (citing *In the matter of Parents on behalf of student v. San Francisco Unified School District*, OAH Case No. 2011020678 at p. 24 ¶ 13) ("*SFUSD*")). According to S.H., in *SFUSD*, the OAH expressly rejected the argument that a procedural violation constituted harmless error because the parents did not actually intend to enroll the child in the school district. *Id.* The OAH in that case found that even if the parents never intended to enroll their child in the school district, they were entitled to the procedural protections of the IDEA so that they could see what the school district had to offer when making the choice between a public placement and a private one. *Id.* What was important, the OAH found, was that the parents had followed every procedural step required of them to obtain the IEP. *Id.* at 14. The same is true here, S.H. asserts. *Id.*

### 2. Discussion

Mt. Diablo argues that the failure to include a general education teacher at the October 14, 2015 IEP meeting was not a violation of the IDEA and that even if it was, it constitutes harmless error. The Court disagrees on both counts.

As it is undisputed that a general education teacher did not provide written input, the participation of a general education teacher could have been excused only if "the parent of a child with a disability and the local educational agency agree that the attendance of such member is not

25

necessary because the member's area of the curriculum or related services is not being modified or discussed in the meeting." 20 U.S.C. § 1414(d)(1)(C)(i). Here, though, it is undisputed that the primary purpose of the IEP meeting was to address the recommendations of Dr. Bernou, who addressed in her report the difficulties S.H. was likely to encounter in general education classes, especially where the classes were large. *See, e.g.,* AR 256-257. As a result of her recommendations, the mix of special education and general education was changed, with the amount of time spent in special education classes being increased. Thus, there appears to be no factual basis for Mt. Diablo to assert that the IEP team did not discuss "the member's area of the curriculum."

The Court also rejects Mt. Diablo's reliance on the fact that Mother signed a consent form excusing the participation of a general education teacher. First, the Court finds no authority suggesting that a parent's consent excuses the participation of an IEP team member even where the reason for the member's failure to participate does not fall within the terms of the statute. Second, the handwritten note on the form belies Mt. Diablo's assertion that Mother's signature indicates her agreement that a general education teacher was not necessary under either of the subsections of Section 1414(d)(1)(C) set forth in the *printed* part of the form. Rather, Mt. Diablo suggested in the note that a general education teacher was not required for a different reason, namely, that S.H. did not have assigned teachers because he did not have a definite schedule. That, however, is not one of the permissible grounds for excusing a team member under the IDEA. Moreover, it is not a correct statement of the law as the Ninth Circuit has held that after the IDEA was amended in 1997, it "no longer requires the presence of the child's current regular education teacher on the IEP team." *R.B., ex rel. F.B. v. Napa Valley Unified Sch. Dist.*, 496 F.3d 932, 939 (9th Cir. 2007). Instead, the IDEA gives school districts broader discretion, allowing them to designate a general education teacher "who is, or may be, responsible for implementing a portion of the IEP, so that the teacher can participate in discussions about how best to teach the child." *Id.* (citation omitted). To the extent Mt. Diablo appears to have obtained Mother's signature by suggesting otherwise, it cannot rely on that signature to demonstrate the required consent.

With respect to the question of whether the failure to include a general education teacher at

the IEP team meeting is subject to a harmless error analysis, the Court concludes that under *M.L. v. Federal Way School. District*, it is not.  In *M.L.*, the Ninth Circuit recognized that "[t]he fact of a procedural violation, standing alone, does not automatically require a finding of a denial of a FAPE."  394 F.3d 634, 645 (9th Cir. 2005) (internal quotation and citation omitted). Rather, only "procedural inadequacies that result in the loss of educational opportunity, or seriously infringe on the parents' opportunity to participate in the IEP formulation process, clearly result in the denial of a FAPE." *Id.*  The court went on to hold, however, that the failure to include a general education teacher on the IEP team in that case was the sort of "structural error" that by itself denies a student of a FAPE and therefore, that harmless error analysis was inappropriate. *M.L. v. Fed. Way Sch. Dist.*, 394 F.3d 634, 648 (9th Cir. 2005) ("the failure to include at least one regular education teacher, standing alone, is a structural defect that prejudices the right of a disabled student to receive a FAPE").  The court observed that Congress added the requirement that a general education teacher participate in the IEP processes in 1997 in recognition of the "central role" that these teachers play in the education of children with disabilities.  *Id.* at 643.  It noted further that in failing to include a general education teacher on the IEP team, the school district "did not include individuals Congress concluded were most knowledgeable about a disabled student's special educational needs."  *Id.* at 646.  The court continued, "[a]s a result, we have no way of determining whether the IEP team would have developed a different program after considering the views of a regular education teacher." *Id.*  The same reasoning applies here, supporting the conclusion that the failure to include a general education teacher in the October 14, 2015 IEP meeting was, by itself, a denial of FAPE.

The Court recognizes that there may be some uncertainty as to whether the "structural defect" analysis set forth in the opinion of Judge Alarcon in *M.L.* is an accurate statement of Ninth Circuit law as both Judge Gould (in a concurrence) and Judge Clifton (in a dissent) expressly rejected Judge Alarcon's "structural defect" analysis, finding that it did not accurately reflect Ninth Circuit law.  *See* 394 F.3d at 654-55, 658.  Judge Gould found that there was no authority that suggested that IDEA violations should not be subject to harmless error analysis and that the legislative history also did not point to that conclusion.  *Id.* at 654-55.  He further opined that "the

27

best means by which to differentiate between such errors is to evaluate each one individually—as colored by each case's particular facts—and to apply a uniform standard that assesses lost educational opportunity or lost parental participation, not by adopting a per se rule that insulates a subset of errors from future review." *Id.* Applying that standard, he went on to find, based on the facts of the case, that the student involved had lost an educational opportunity as a result of the failure of the school district to include a general education teacher and therefore, that the procedural violation was not harmless. *Id.*; *see also Capistrano Unified Sch. Dist. v. Wartenberg,* 59 F.3d 884, 891 (9th Cir. 1995) ("We have never adopted as precedent the structural defect approach discussed by Judge Alarcon in *M.L. v. Federal Way School District*").

The Court need not resolve this tension in Ninth Circuit case law because it finds that even if the failure to include a general education teacher is subject to harmless error analysis, the error is not harmless here. First, the Court rejects Mt. Diablo's assertion that it is somehow excused from complying with the procedural requirements of the IDEA because Mother may not have intended to enroll S.H. at MDHS. Mother requested an IEP and was entitled to the same procedural protections as any parent who seeks to determine what services the school district will provide in order to make a decision about S.H.'s placement. Even if it was unlikely she would move S.H. to MDMS and she anticipated seeking reimbursement for his private placement from the school district if she did not, she was entitled to the IDEA's procedural protections. *See In the Matter of Parents on behalf of Student v. San Francisco Unified School District*, OAH Case No. 2011020678, at p. 24, ¶ 13 (finding that "even if Student's parents had never intended to enroll Student in a public school, they were still entitled to the protections of the IDEA").

Second, the Court concludes that the lack of participation of a general education teacher significantly impaired Mother's ability to participate in the IEP process because Mother was deprived of the opportunity to ask questions about the significant portion of the day that S.H. was to be placed in general education classes under the interim IEP. Dr. Bernou had raised concerns about S.H.'s ability to function in general education classes due to the likelihood that such classes would be large, making it difficult for S.H. to stay focused and decreasing the likelihood that the teacher would be able to give S.H. the attention he would need to regain his attention and keep

him focused; she also noted the fact that S.H. engaged in certain odd behaviors in the classroom that would not be shared by students in general education classes, raising the possibility that the environment would be less conducive to learning for S.H. Mother was entitled to hear the opinions of a general education teacher with experience and knowledge of general education classes at MDHS with respect to these concerns so that she could understand the implications of the interim offer and make a meaningful determination as to the adequacy of the offer. Therefore, the Court concludes that the absence of a general education teacher at the October 14, 2015 IPE meeting violated the IDEA and did not constitute harmless error.

### F.    Remedy

The Court has found that Defendant denied S.H. a FAPE by: 1) failing to specify whether the speech and language services offered in the interim IEP were group or individual; 2) failing to include a general education teacher at the October 14, 2015 IEP meeting; and 3) improperly offering only an interim IEP in the fall of 2015 and using an invalid IEP as the starting point for the interim IEP. It now must determine an appropriate remedy.

The IDEA authorizes courts to grant "such relief as the court determines is appropriate." 20 U.S.C.A. § 1415(i)(2)(C)(3). The Supreme Court has held that this provision gives courts "broad discretion" to determine the appropriate remedy where a FAPE has not been provided. *Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 369 (1985). "[E]quitable considerations are relevant in fashioning relief." *Id*. at 374. Where parents have unilaterally placed a child with a disability in a private school, reimbursement for the cost of enrollment may be awarded "if the court or hearing officer finds that the agency had not made FAPE available to the child in a timely manner prior to that enrollment and that the private placement is appropriate." 34 C.F.R. § 300.148; *see also C.B. ex rel. Baquerizo v. Garden Grove Unified Sch. Dist.*, 635 F.3d 1155, 1159 (9th Cir. 2011) ("A parent or guardian is 'entitled to reimbursement only if a federal court concludes both (1) that the public placement violated the IDEA, and (2) that the private school placement was proper under the [IDEA].'")(quoting *Cty. of San Diego v. California Special Educ. Hearing Office*, 93 F.3d 1458, 1466 (9th Cir. 1996)). In *C.B.*, the court explained that "[i]f either criterion is not met, the parent or guardian may not obtain

29

1  reimbursement" whereas "[i]f both criteria are satisfied, the district court then must exercise its

2  'broad discretion' and weigh 'equitable considerations' to determine whether, and how much,

3  reimbursement is appropriate." *Id.* (citing *Florence Cty. Sch. Dist. Four v. Carter By & Through*

4  *Carter*, 510 U.S. 7, 15-16 (1993)).

5        In this case, the hearing officer in the OAH proceeding addressed the question of whether

6  reimbursement for the cost of enrollment at Orion was an appropriate remedy for the violations of

7  the IDEA relating to the failure to specify the type of speech and language services to be provided

8  and the absence of a general education teacher at the October 14, 2015 IEP meeting.  She

9  concluded that reimbursement for S.H.'s enrollment at Orion was not an available remedy.  AR

10  635-636.  First, she concluded that under 34 C.F.R. § 300.148, S.H. would have had to have been

11  denied FAPE by Mt. Diablo *before* he enrolled at  Orion, which was not the case as S.H. enrolled

12  at Orion before he even registered at Mt. Diablo.  Similarly, she reasoned, S.H. did not give the

13  required *prior* notice to Mt. Diablo of his intent to enroll at Orion.  AR 636.  Finally, she

14  concluded that S.H. had not demonstrated that Orion was an "appropriate placement."  AR 636.

15        The OAH findings on the question of whether Orion was an appropriate placement were as

16  follows:

> Student was inappropriately retained in ninth grade and was
> repeating classes at Orion he had successfully passed at Los Lomas
> and for which he received high school credit. Dr. Stewart admitted
> that Student did not meet the criteria to be retained in a public
> school. Student also failed to show that he had been receiving
> educational benefit while at Orion. He did not show that he had
> made educational progress in the area of academics, behavior or
> social skills while he was enrolled at Orion. There was no reliable
> evidence presented showing any academic progress. The behavioral
> reports at the end of the first term at Orion were virtually identical to
> the reports from the previous year at Los Lomas. Student also did
> not show that his social skills improved while at Orion. Again, the
> reports of Student's social skills were also virtually identical to the
> reports from Los Lomas. He did not show that the courses in which
> he was enrolled were appropriate for him including the Dog Class,
> Homebridging and Personal Projects. Therefore, Student failed to
> show that placement at Orion was appropriate and reimbursement
> for the placement must also be denied for this reason.

26  AR 636.  These findings were based on an in-depth review of the evidence relating to S.H.'s

27  placement at Orion in the fact section of the decision.  *See* AR 612-615.

28        The OAH went on to address an appropriate remedy for the failure to specify the type of

30

speech and language services offered in the interim IEP.  AR 637.  This question was

"complicated" the OAH found, because "Student put on no evidence regarding compensatory

speech and language" and "Student did not establish what services were actually

provided" prior to his enrollment at Orion.  *Id*.  In this context, the OAH went on to reach the

following conclusions as to an appropriate remedy:

> The evidence established that Student needs social skill instruction through speech and language services and that he has benefited from them in the past. It is appropriate to deliver social skills speech and language compensatory services for Student in a small group, so that Student can practice what he learns with other students. Mt. Diablo denied Student a FAPE from October 14, 2015 through March 1, 2016, a total of about 20 weeks. Therefore, Student is entitled to 20,40-minute sessions of group speech and language services, focusing on social skills. Parents shall provide Mt. Diablo with the name of a certified non-public agency of their choice and Mt. Diablo shall contract with the provider promptly. The services shall conclude no later than August 30, 2017.

*Id*.

With respect to the failure to include a general education teacher at the October 14, 2015

IEP meeting, the OAH concluded,

> For Mt. Diablo's failure to have a regular education teacher at the IEP team meeting, Mt. Diablo shall notice and convene an IEP team meeting within 30 days of this decision. All required members shall be in attendance. Mt. Diablo will pay for Dr. Bernou to attend the IEP team meeting and the IEP team shall consider her assessment.

*Id*.  The OAH went on to deny S.H.'s request for compensatory education in the areas of math and

Writing on the grounds that "Dr. Bernou's determination that Student needed this compensatory

education was not based upon any calculation of an appropriate amount based on any denial

of FAPE by Mt. Diablo for Student, but appears to be a recommendation for remediation."  *Id*.

The OAH further found that S.H. did not show that Mt. Diablo's offer of writing or math was not

appropriate for Student and resulted in any denial of FAPE."  *Id*.

In determining the appropriate remedy here, and in particular, whether S.H. should be

reimbursed for the cost of attending Orion for a school year, the Court affords significant

deference to the conclusion of the hearing officer that S.H. did not establish that Orion was an

"appropriate" placement for S.H. The hearing officer reviewed the evidence in the record and made specific findings in support of the conclusion. *Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 891 (9th Cir.1995) (internal citations omitted) (holding that while the level of deference that the court gives to the ALJ's findings is discretionary, it "increases where [the findings] are thorough and careful."). Further, the findings appear to be reasonable in light of the evidence cited by the OAH in support of its conclusions.

The Court also notes that Plaintiff made no meaningful effort in the motion papers (including the supplemental brief requested by the Court to address the appropriate remedy in this case) to challenge the OAH's findings as to the appropriateness of the Orion placement. Plaintiff states in the supplemental brief that S.H. established that Orion "provided educational instruction designed to meet Student's unique needs" by presenting testimony of Dr. Stewart, the director of Opinion, and Aiko Akers, S.H.'s literature teacher at Orion. Plaintiff's Supplemental Brief at 4. The hearing officer, however, identified what she found to be shortcomings in the testimony of both of these witnesses, concluding that their testimony was not sufficient to show that the Orion placement was appropriate. S.H. did not address those shortcomings or explain why the conclusions of the OAH were incorrect on this issue. Therefore, the Court concludes that S.H. has not shown that Orion is an "appropriate placement" and denies S.H.'s request for reimbursement of the cost of attending Orion on that basis.

The Court also finds that the remedy awarded by the OAH as to the failure to specify the type of speech and language services is appropriate. Therefore, Mt. Diablo shall provide S.H. with 20 40-minute sessions of group speech and language services, focusing on social skills, to conclude no later than July 2018.

The Court also gives significant weight to the OAH's findings as to S.H.'s request for math and writing instruction, which the Court declines to award. Again, the OAH decision offered specific reasons for concluding that such instruction would be remedial and was not related to any denial of FAPE. In his briefs filed in connection with the instant motions, however, S.H. did not address the reasoning or conclusion of the hearing officer on this question.

Next, the Court must decide what remedy should be awarded for Mt. Diablo's failure to

32

include a general education teacher at the IEP meeting and its failure to offer a full IEP, which would have included goals for S.H. Although compensatory education may be an appropriate remedy where FAPE has denied, S.H. has not pointed to any specific compensatory education that would be tailored to the shortcomings in the IEP process that the Court has found – either the completion of an interim IEP that did not contain goals or the failure to include a general education teacher at the meeting. Therefore, the Court concludes that the appropriate remedy for these violations is the convening of an IEP meeting in which all required participants will participate. In addition, Mt. Diablo is ordered to conduct a full IEP (including goals) rather than an interim IEP.

Finally, the Court awards reasonable attorneys' fees to S.H. pursuant to 20 U.S.C. § 1415(i)(3)(B) (permitting the court, in its discretion, to award "reasonable attorneys' fees as part of the costs . . . to a prevailing party who is the parent of a child with a disability").

## IV. CONCLUSION

For the reasons stated above, Plaintiff's summary judgment motion is GRANTED. Defendant's summary judgment motion is DENIED. The parties shall meet and confer and within thirty (30) days shall submit a joint proposed order that establishes a schedule for convening an IEP meeting consistent with this Order and for briefing on S.H.'s motion for attorneys' fees and costs.

**IT IS SO ORDERED.**

Dated: July 3, 2017

_____
JOSEPH C. SPERO
Chief Magistrate Judge